FITCHBURG STEAM ENGINE CO. v. EDWIN A. POTTER et al.

and

F. K. WHITTEMORE et al. v. EDWIN A. POTTER et al.

*Opinion filed June 23, 1904—Rehearing denied October 13, 1904.*

1. MASTERS IN CHANCERY—*report prepared by attorney of litigant should be suppressed.* A master's report prepared by counsel for the successful party at the suggestion of the master before the latter had announced his decision, which the master adopted as his own with slight changes, and to which adverse counsel, who were ignorant of the facts, filed objections, which were overruled and the report presented to and accepted by the chancellor as the work of the master, should be suppressed when the facts are discovered.

2. SAME—*when cause should be re-referred.* After suppression of a master's report for improper conduct, if the case involves adjustment of many accounts of various parties for long periods, the case should be referred to another master, and in the absence of consent of the parties that the latter may report his conclusions of fact and law from the testimony already taken, the reference should be for new proofs and report.

3. SAME—*master entitled to only statutory fees for taking testimony.* A master in chancery for taking and reporting testimony is entitled to such fees only as are specified in the statute, and can demand fees for such other services only as under the statute he is entitled to receive compensation for, which compensation, in counties of the third class, is to be determined by the chancellor in view of the nature and character of the services rendered.

4. SAME—*usage and custom are not a basis for master's fees.* Usual and customary charges among masters in chancery of counties of the third class for services in reporting conclusions of law and fact are not a proper basis for determining their compensation.

5. SAME—*what master must show in claim for compensation not fixed by statute.* The claim of a master in chancery in a county of the third class for reporting conclusions of law and fact should show the time he was necessarily employed in examining the questions and preparing his report, and he must sustain the same by proof if its correctness is challenged by the parties.

6. SAME—*basis for computing master's compensation for quasi judicial services.* The basis for compensation to a master in chancery for service in connection with reporting conclusions is the time which one having the requisite qualifications would be required, in view of the volume of the testimony and the character of the case, to devote to a proper report.

7. SAME—*what cannot be considered in fixing master's charges.* Neither the amount involved in litigation nor the customary charges of attorneys are an element for consideration in determining the sum which shall be paid to the master in chancery for reporting conclusions of law and fact.

8. SAME—*master not entitled to fees if report must be suppressed.* If the report of the master in chancery is suppressed for his improper conduct he is not entitled to fees for services connected therewith, but if his report of the testimony is, by consent of the parties, used on re-reference, the statutory fees therefor may be taxed.

*Potter* v. *Fitchburg Steam Engine Co.* 110 Ill. App. 430, reversed.

APPEAL from and writ of error to the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. A. H. CHETLAIN, Judge, presiding.

PAM & HURD, and ASHCRAFT & ASHCRAFT, for appellant and plaintiffs in error.

MORAN, MAYER & MEYER, for appellees and defendants in error.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The Appellate Court for the First District reversed the decree of the superior court of Cook county foreclosing two trust deeds on the property of the Chicago Beach Hotel Company, and declaring the priorities of holders of obligations of the hotel company secured by said trust deeds, and granting other relief, and remanded the cause, with directions to enter a final decree as specified in the judgment of reversal. The Fitchburg Steam Engine Company prosecuted an appeal from that branch of the decree in which it was interested, and F. K. Whittemore, Samuel A. Tolman and the Commercial Loan and Trust Company brought the record in review in this court by means of a writ of error which they procured to be issued out of this court for that purpose. The causes were consolidated and presented in this court as one case.

On January 5, 1893, the Chicago Beach Hotel Company, a corporation, issued two hundred and fifty bonds of the company, each for the sum of $1000, payable on the first day of January, 1901, bearing interest at six percentum per annum, and to secure the payment of the bonds executed and acknowledged a trust deed to the Northern Trust Company of Chicago, as trustee, whereby it mortgaged the unexpired portion of a lease for the term of ninety years of a certain piece or parcel of property, being part of the fractional north-west quarter of section 12, town 38, north, range 14, east of the third principal meridian, which was more particularly described by metes and bounds in the trust deed. Eight of these bonds were not disposed of by the hotel company. The hotel building was completed and furnished at an expense which largely exceeded the amount realized from the sale of the bonds, and the company became indebted to a number of firms and corporations. Among other of such creditors the hotel company became indebted to the Fitchburg Steam Engine Company for certain boilers which were installed in the hotel building, and the appellant steam engine company claimed a lien under the mechanic's lien laws of the State.

On the 24th day of August, 1893, in pursuance of a plan for retiring the bonds secured by the before mentioned trust deed and to secure funds to adjust its other obligations, the hotel company executed its bonds in the total sum of $400,000 and executed a second trust deed, whereby it mortgaged the same real estate described in the first trust deed, and also the furniture and fixtures of the hotel, to secure the payment of the last mentioned bonds, and also executed a chattel mortgage on the fixtures and furniture of the hotel as like indemnity for the said last series of bonds. Bonds secured by this second trust deed were exchanged for all of the bonds which were secured by the first trust deed, except such of said bonds of the first issue as were held by the plaintiffs

in error and by the defendants in error Gormley, Potter, Hately, Witters and Mulliken. The affairs of the hotel company were not prosperous, and the company subsequently became involved in further indebtedness, failed to pay the ground rent upon the lease, interest upon its bonded indebtedness, the demand of the appellant engine company, and other claims and demands against it.

On the 12th day of January, 1899, the Equitable Trust Company, as trustee in the second trust deed executed by the hotel company, and Edwin A. Potter, James H. Gormley and John C. Hately, the owners of ten of the first series of bonds issued by the hotel company, filed in the superior court of Cook county this their bill in chancery against the hotel company, the Fitchburg Steam Engine Company, F. K. Whittemore, Samuel A. Tolman, Pearl C. Witters, E. W. Mulliken and the Commercial Loan and Trust Company, owners and holders of certain of the bonds of the hotel company of the first series, for a decree directing an accounting to be had and taken; "that an accounting may be taken of the number and amount of said first and second bonds, and the respective over-due coupons thereto, outstanding under said two trust deeds, and of the interest due upon the same, and of the amount of said first bonds outstanding for value and not pledged or deposited to secure the said second bonds, and of the amount of the said first bonds outstanding for value and pledged or deposited to secure said second bonds; that the said trust deed or mortgage securing said first bonds may be found to constitute a first lien on all of the property of said hotel company for the payment of the said $250,000 first bonds and the coupons thereto; that the said hotel company may be decreed to pay to your orators, said complainant bondholders, said sum, to-wit, $40,000, advanced and paid, as aforesaid, for ground rent, insurance and taxes, and that the same may be decreed to be a first and prior lien on the premises herein described and the improvements thereon, and that said hotel com-

pany may be decreed to pay the amount so found due on said first bonds not pledged or deposited, and such part of the amount so found due on said first bonds pledged or deposited, as aforesaid, as may be necessary to pay the amount so found due on said outstanding second bonds, with costs, expenses, solicitors' and trustee's fees and the allowances (as herein alleged proper) to be fixed by the court;" and for foreclosure of the two trust deeds executed by the hotel company, and for other relief.

Answers were filed to the bill and replications to the answers, and the cause was referred to master in chancery Barber to take the proof and report the same, together with his conclusions of law and fact. The contention of complainants in the bill was, that such of the bonds of the hotel company of the first series as had been delivered by the holder to the Equitable Trust Company and bonds of the second series received therefor, were not surrendered to be canceled but to be held by the trust company as unsurrendered and unpaid, and as collateral security for the bonds of the hotel company of the second series which had been delivered in exchange for said bonds of the first series, and that they were entitled to a decree foreclosing the first trust deed given to secure the principal and all accruing interest on the first series of bonds as a first lien on the property of the hotel company. The contention of the defendants to the bill was, that such bonds of the first series were surrendered to the trust company to be canceled and were paid by the acceptance of bonds of the hotel company of the second series, and that the lien of the first trust deed executed by the hotel company had thereby become extinguished, except as to the bonds of the first series that had not been surrendered to the Equitable Trust Company.

The master in chancery, on the 5th day of July, 1901, reported the proofs introduced before him by the respective parties, and presented what purported to be his findings of the facts established by the proofs and his

conclusions as to the principles of law applicable to such facts and governing the case, together with the recommendation that a decree be entered in accordance with the contentions of the complainants in the bill.   Objections to the findings and conclusions set forth in the report, which had been interposed before the master and overruled, were also presented by the master, and the same objections were filed and renewed as exceptions to the report in the superior court.   The case was submitted to the chancellor on the objections and exceptions to the report of the master, and while the cause was pending for decision and before the rendition of the final decree, to-wit, on December 26, 1901, the master presented his claim for fees in the total sum of $1795.  Objections were filed to the allowance of his fees in the amount claimed, and proofs were heard as to that contention.   In the course of this hearing it was disclosed that after the proofs in the case had been submitted to the master and after counsel for the respective parties had presented to the master their arguments on the points of fact and law involved, the master, without announcing that he had reached a conclusion on any matter of fact or law, and without notice, and without the knowledge of counsel for the appellant and plaintiffs in error, asked one of the solicitors for the appellees and defendants in error to send him a draft of findings of fact in the case, and that such solicitor prepared a full and complete master's report to the court, including findings of fact, conclusions of law and a recommendation that a decree should be entered in favor of his clients, and delivered the same to the master; that the master made some immaterial changes in phraseology, had a typewritten copy made, returned the original draft to the solicitor who wrote it, signed the typewritten copy as his report, placed it before counsel for the appellant and plaintiffs in error as his report for their objections, heard and overruled the objections they presented to it, and filed the same in the

superior court as his report as master; that neither the chancellor nor counsel for the appellant and plaintiffs in error knew that the report had been prepared by opposing counsel until the same was brought out in the hearing of the objections to the allowance of the fees claimed by the master.

The master testified that after he had caused the report, as prepared by the solicitor, to be copied on the typewriter, he returned the original draft to the solicitor who prepared it, but the solicitor, when testifying on the hearing, stated that he did not think he had such original draft. The original of the master's report was not produced in court. The master was unable to indicate any change or changes that he had made in it, and the solicitor was likewise unable to point out that the report, as presented to the court, was in any respect different from the report which he had prepared. The solicitor testified that the master did not ask him to submit any conclusions as to points of law and did not request him to make a complete report, but, to quote from the abstract, the master "suggested to me that if I cared I could submit to him such findings of fact as I thought would be proper or as I would desire to have found in favor of my client." The solicitor stated that when he came to consult the exhibits in the case and such papers and files as he, himself, had, he concluded that for the purpose of making such findings as "he thought he ought to have," it was more "logical" to prepare a complete report, and did prepare the document which was finally adopted by the master as his report, and which set forth conclusions of law and the recommendation of the master for a decree in favor of his client, as well as findings of fact. The solicitor further testified: "I delivered the report in person to the master, and explained to him that the calculations were not made by me in person, but that I had them made by an expert accountant, and had no doubt they were correct, and I left with him, I think, all

the exhibits he had, and told him if there was any explanation he wanted as to figures or anything of that kind, of course I would be glad to let him know about it." Both the master and the solicitor testified that the master did not indicate to the solicitor that he had determined to decide the points of law and fact in favor of the clients of the solicitor.

These facts having been disclosed, one of the plaintiffs in error thereupon moved the court to suppress the report of the master as to his conclusions of law and fact and his recommendation for a decree and that such conclusions and findings and recommendations be not considered by the court, but the court overruled the motion and also the objections to the allowance of the fees demanded by the master, and found that the claim of the master for fees in the sum of $1795 was just and should be allowed, and in the final decree which was afterwards entered, ordered that such sum be paid to the master out of a fund which constituted the means of payment of the amounts due to the respective parties from the said hotel company, whereby the parties were, in effect, required to pay the amount of the allowance to the master in proportion as they were, respectively, entitled to share in said fund.

It is urged that the chancellor had orally announced in open court his "opinion and decision" in the case before the motion was made to suppress the findings and conclusions set forth in the master's report, and we find a statement to that effect incorporated in the certificate of the evidence heard on the motion to tax the master's fees. But the transcript of the record does not show any disposition of the objections and exceptions to the master's report until the final decree in the cause was rendered on the 15th day of July, 1902, some months after the time it came to the notice of the chancellor and counsel that the report or findings and conclusions of the master had been prepared by the solicitor for one of the

litigants. The chancellor recited in the final decree that certain facts appeared to be established by the testimony which had been taken by the master, and declared and applied, incidentally, certain principles of law, and ordered "that the exceptions to the master's report herein, in so far as they are in conflict with the above findings of fact and conclusions of law, be and the same are hereby sustained, and the master's report is in all other things approved." It was clearly within the power of the chancellor to have made such order with reference to the suppression of the findings and conclusions set forth in the report of the master, and the recommendations for a decree therein contained, as should have been made in view of all the facts disclosed to the court by the evidence on the hearing of the objections to the claim of the master. Though the chancellor formally denied the motion to suppress the report, he did not accept the findings and conclusions of the master, nor did he render the decree in conformity with the recommendations found in the report of the master. The decree of the chancellor was favorable to the contention of the appellant and plaintiffs in error, but an appeal was perfected to the Appellate Court for the First District, and in that court the findings and recommendation of the master were approved and the decree of the superior court was reversed, with directions to enter a final decree substantially in accordance with the findings and recommendation set forth in the report signed and presented to the court by the master.

We think the chancellor should have suppressed the findings of fact and conclusions of law incorporated in the report of the master. Our views are, in part, expressed by the remarks of the chancellor in passing on the motion to suppress, as follows: "There is a manifest impropriety in calling, in the first instance, upon one side to prepare both the findings of fact, which should be exclusively those of the master himself, and the conclu-

sions of law, calling upon the counsel in whose behalf the decision is rendered for a draft of findings and conclusions both of fact and law; simply for the reason, not that in any particular case wrong is done, but that it opens the door to fraud and suspicion and tends to lower the administration of justice." The Appellate Court also well said: "The decision of the master should be above all possible suspicion of bias or improper influence, direct or indirect, from counsel in the case. However honest and desirous a master may be of reporting strictly according to the law and evidence, such a course as was here pursued is liable to cause his fairness to be questioned by the unsuccessful party. * * * Its [the report] language would naturally be that of the advocate and show the bias and interest of the solicitor, whereas it should state tersely and plainly, though fully, conclusions of fact and law, without any amplification of the theories of counsel or of argument to support the conclusions stated."

The course of the master in asking counsel for one of the litigants to prepare findings in a case pending before him, before he had fully formed and publicly expressed his decision and without notice or knowledge of opposing counsel; the acceptance by the master from counsel for one of the litigants of a completed report in the case containing findings of fact and conclusions of law and a recommendation for a decree favorable to the client of such solicitor, and the adoption of such completed report as the report of the master in the cause, without the knowledge of opposing counsel and without notice to opposing counsel that the report had been prepared by other counsel and presented to the master, and without giving opposing counsel an opportunity, before adopting such draft of a report, to discuss it as the proposed report of his adversary, must be condemned, not only because, as said by the chancellor, "it opens the door to fraud and suspicion and tends to lower the administra-

tion of justice," but for other reasons.   It tends to prevent that fair and impartial investigation of the proofs and the law by the master and that more thorough re-examination of the case which would become necessary if the master should discharge his own duties and set forth his own findings.   A report so prepared is likely to warp the judgment and discretion of the master and to lead to a biased and prejudiced view of the weight of the evidence, the principles of law applicable thereto, and to induce him to accept and report to the court an erroneous recommendation as to the proper decree to be entered in the cause.   Nor does the evil end there, for the findings, conclusions and recommendation penned by counsel come to the chancellor purporting to be the solemn, official act of the master, to which weight should be given as taken after full and impartial investigation of all the proofs and the principles of law applicable thereto.   And further, in the Appellate Court and in this court, on review of the decree, the work of counsel will be imposed on the courts as being the result of the investigation, research and deliberation of a disinterested public master in chancery, acting in his official character and actuated by no other desire than to administer justice and equity between contending litigants.

The master in this case testified: "It is highly advantageous to give the counsel the benefit of their own phraseology [in the findings and report of a master] if they wish it, and I did that in this case."   No one can fail to recognize the truth of the view expressed by the master that counsel may derive a very great advantage for his client in the mere matter of phraseology if permitted to frame the findings and conclusions for the master.   That the master, with full knowledge of the advantage that one litigant would thus improperly obtain over his adversary, should have deliberately and secretly given such power to the solicitor is most astounding.   In *Stone* v. *Stone*, 28 N. J. Eq. 409, the fact that the report of

the testimony and the findings of the master appeared to be in the handwriting of the person who drew the bill was regarded as ground for rejecting the report. At the hands of counsel the phraseology of a finding of fact or a conclusion of law could plausibly give undue prominence to one fact, omit qualifying facts or minimize their proper effect, select authorities and suggest argument favorable only to the case of one of the litigants in such manner as to destroy the report of the master as a calm, dispassionate and disinterested statement of the findings, conclusions and recommendations of the master as an "arm of the chancellor." The phraseology of counsel in a report which the master realized would be of benefit to the client of counsel when the report came to be considered by the chancellor, could not fail to produce the same improper effect and influence in the mind of the master and lead him to adopt the views of counsel as expressed in the phraseology of the report. That the report prepared by counsel did have its influence on the mind of the master appears from the following testimony of that officer: "When I received a report from Mr. Mayer, I went through it item by item, inch by inch, you might say. . I had subjected the computation to examination. I have an indistinct recollection on that point. Whether I made this examination myself or submitted it to my accountant in my office, I found the reports substantially correct. My attention was given to the legal propositions, largely. Questions of fact were seriously disputed. I cannot tell what changes I made in it. They were not material—changes in phraseology. I do not know that there was any change in substance I couldn't remember what change in phraseology. There were perhaps half a dozen changes made. I can't say on what subject. I thought the report as presented to me was one of the most elaborate and complete documents I had ever seen of the kind. I concluded to adopt the report submitted by Mr. Mayer as soon as I completed examination of it."

It is the duty of the courts of equity to guard with the most zealous care the right of litigants to have the unbiased and impartial judgment of the master upon the evidence produced before him, under the law, as counsel have in open argument presented it or as he may have found it to be by his own uninfluenced efforts. Whether the master in the case at bar was or was not improperly influenced by the report prepared by counsel may not be known to himself, much less to the chancellor or the courts of review. In *Dorlon* v. *Lewis*, 9 How. Pr. 1, speaking of the possible improper effect of the influence of findings and conclusions prepared by counsel for the successful party on the mind of the master or a referee, it was said: "Whether it did or not, perhaps the referee himself cannot be entirely sure. At any rate, in a case where, as the referee says, there was much testimony on either side, and a large amount of this was conflicting, such a consideration ought not to have been presented to the mind of the referee. It may have had its effect without his being conscious of it. Such a thing is at least possible, and that, upon the principle already stated, is enough to justify the court in setting aside the report."

Counsel who presents objections and exceptions to the report of the master, and the chancellor who is called upon to consider and determine such exceptions, must proceed upon the theory that the summing of the evidence and the findings of fact and statements and declarations of legal principles found in the report are the result of the investigation by the master of the testimony and the law, uninfluenced by counsel for either party, except so far as such influence was exerted during the open hearing of the controversy before the master, when counsel for all the parties were present. For this reason the chancellor accords a certain degree of weight to the findings and conclusions set forth in the report. When, as in this case, it is proven the master, before he had fully determined the facts and the law, or at least

before he had openly announced such decision, granted to counsel for the successful litigant the privilege of framing the findings of fact without the knowledge of adverse counsel, and because he knew that it is highly advantageous to the cause of the successful party to permit his counsel to select the language to be employed in summing the evidence and stating the facts found, and when counsel to whom such favor is granted prepares not only the findings of fact but conclusions of law and the recommendation of the master for a decree in favor of his client, and submits a completed report of the master ready for the signature of the master, and the master copies such report, making only some unimportant changes, returns the original to the counsel who prepared it, requires adverse counsel, who are ignorant of the facts, to treat the report as having been prepared by the master, hears and overrules their objections and presents the instrument to the chancellor, and causes it to be accepted by the court and counsel as the result of the investigation made by him as to the facts proven and as to the law governing the right of the parties, discussion as to the duty of the chancellor, when advised as to the true character of the report, is not, in our opinion, necessary. The report should be suppressed, and having been so suppressed the chancellor would have before him only the report of the testimony taken before the master.

The contention in this case involved the adjustment of many different accounts, covering transactions with a number of different parties for a period of eight or nine years, and the case was one of that character which we have frequently held the court should not proceed to a final hearing in until an account has been stated by the master and objections thereto settled by him. (6 Ill. Cyc. Dig. 1060, 1061.) The conduct of the master, which required the suppression of his findings of law and fact and recommendation for a decree, would forbid a re-ref-

erence to him. Reference to some other master would become, therefore, the only course to be pursued. The objections to the master's report of the proofs challenged the correctness of the decision of the master with reference to the admissibility of certain proof, and the newly selected master could not be bound by the conclusion of the former master as to the admissibility of such testimony. Furthermore, the newly selected master, in order to correctly determine contested questions of fact from conflicting oral testimony, ought to have, and would be entitled to have, the aid to be derived from seeing the witnesses and hearing them testify. The benefit of seeing the witnesses and hearing them testify has been repeatedly declared by this court. The master to whom the case is re-referred ought not, except by agreement of the litigants, be directed to report findings of fact and conclusions of law from the proof as reported by the master to whom the cause had been first referred. "Where a referee becomes disqualified to act, all proceedings upon the trial before him necessarily end, and it is not within the power of the court in appointing a new referee to hear and determine the cause, to compel the new referee to decide the issues upon testimony taken before or rulings made by the referee first appointed." (17 Ency. of Pl. & Pr. 1085.) Unless the parties should consent that the master to whom the case is to be referred should make his finding and conclusions from the evidence as reported by the former master, the case should be referred anew to another master for proofs and his report therein.

The action of the court in decreeing that the master should be paid $1795 as fees for the official services rendered by him remains to be considered. Of this amount the sum of $159.82 was the fee allowed the master, under the statute, for taking and reporting the testimony in the case, and the remainder, to-wit, $1635.18, was allowed to the master on proofs produced before the chancellor

as his fee for considering the evidence and reporting his
conclusions to the chancellor.   The latter amount seems
to have been fixed upon as the just and reasonable amount
which the litigants should be called upon to pay, from
proof which tended to show it to be the usual and cus-
tomary charge according to the usage and custom pre-
vailing among masters in chancery in Cook county and
among attorneys and solicitors engaging in the practice
of their profession at the Cook county bar.   But very
slight reflection will lead to the conclusion that "the
usual and customary charges of masters in chancery"
furnish no proper basis for determining the amounts
which litigants should be required to pay for the services
of the master.   Where competition in business affairs and
among the professions may influence prices and charges,
and where the party who is to be called upon to pay had
the right to select with whom he would deal or whose
services he would secure and the right to contract as to
the amount to be paid, and has dealt with another with-
out any contract expressly fixing the amount he should
be required to pay, the usual and customary prices and
charges in the business or profession are accepted in
courts as aiding to guide the mind to a correct conclu-
sion.   But the law has authorized the appointment of
masters in chancery and empowered the courts to require
litigants to accept their services.   The proposition that
masters may establish among themselves customs and
usages as to charges and thereby fix the amounts that
litigants shall pay them, would be to make the masters
themselves the judges of the justice of their own demands.
It is made by the statute the duty of the courts to deter-
mine what compensation the master may justly claim for
services for which no fee is fixed, and that cannot be de-
termined on consideration of what masters usually and
customarily charge, for that would be to make the mas-
ters the judges of their own demands against the liti-
gants,—a proposition which not only has no support in

any rule of evidence, but is inconsistent with every sentiment of natural justice. It is for the court to determine as to the fees of the master for any service for which, under the statute, the parties are required to pay him and for which no fee is fixed by the statute, and no custom or usage can properly grow up among masters as to the amount which shall be allowed by the court. Nor do the usual and customary charges of attorneys or solicitors aid the court to determine the fees and charges to be paid to the master. Attorneys and solicitors hold themselves out as possessed, to a reasonable extent, of knowledge of legal principles and of the ability and skill in the trial and management of causes necessary to the proper discharge of the duties of their profession, and by their contract of employment are held to undertake to exercise a reasonable degree of skill, diligence and care in and about the business of their clients, and are liable in damages to their clients for any failure to exercise that degree of skill and diligence which the law requires of them. The measure of damages in such instances is the extent of the loss which thereby resulted to the client. For this reason, among others, the amount involved in the litigation is an element to be considered in determining the reasonable compensation of attorneys and solicitors. The duties of a master in chancery here under consideration are those of an assistant or adviser to the chancellor, and no such liability attaches, and no reason is perceived why the amount involved in the litigation should constitute an element for consideration in determining the sum which should be paid to the master.

Masters in chancery hold their offices *cum onere,* and can demand fees for such services only as, under the statute, they are allowed to receive compensation for, and are restricted to the fees specified in the statute, when a fee is specified. (*Schnadt* v. *Davis,* 185 Ill. 476.) The taking and reporting of testimony is a statutory

duty for which a statutory fee is provided, and no more can be recovered for such services. The fee so allowed covers every service necessary and incident to the work of taking and reporting the testimony. In hearing arguments of counsel after the evidence has been taken, and in considering the testimony and as to the principles of law applicable thereto, and in framing the findings of fact and conclusions of law and hearing and settling objections thereto, the functions and duties of a master in chancery are ministerial in character, and the compensation to be allowed therefor, in counties of the third class, is not expressly fixed or limited by the statute, but is to be determined by the chancellor in view of the nature and character of the services rendered. Being the assistant and adviser of the chancellor, his compensation may be measured, to some extent, by the standard of judicial compensation. The labors and duties of masters in making findings of facts and reaching conclusions of law are not of that conclusive character as are those of the chancellor, but are merely advisory in their nature. (*Hards* v. *Burton*, 79 Ill. 504; Henderson's Chancery Practice, p. 161.) The character of the duties performed by the master being inferior to those of the chancellor, the compensation should be correspondingly lower. The parties who are called upon to pay the master should not be required to defend against demands for amounts in gross, but have the right to know the specific service for which they are to be called upon to make payment. The claim of the master should be so itemized as to distinctly show the service which he has rendered for which he claims the right to make a charge. So far as the statute has prescribed fees for such services, the statutory provision must control and be accepted in full discharge of all that is included in that service. The statute, however, provides that in counties of the third class, which includes Cook county alone, masters in chancery may receive for examining questions of law and fact and reporting con-

clusions thereon, such compensation as the court may deem just. The claim of the master should therefore show the time he was necessarily employed in the examination of questions of law and fact and in preparing his report of such findings and conclusions, and if the parties who are called upon to pay the demands of the master object to the claim as presented, the master should be required to support his claim with proof, as are other claimants in courts of justice. The proof so produced should show to the court the services rendered, the time actually and necessarily devoted by the master to the work, and such other facts as will enable the court to intelligently determine the rights of the master and the proper obligations of the litigants. The court should then adjust the compensation of the master for the services of the character we are here considering, by the standard of judicial compensation, and should not, in any event, allow for services of the character here to be considered, compensation per diem equal to that of the judge of the court if reduced to a per diem basis for the working days of the year. The master's position and responsibility are inferior to those of the chancellor. His duties are but advisory, and are subject to be accepted, modified or rejected, as the superior learning and judgment of the chancellor shall find proper, and his services can not be regarded as of equal dignity or value with those of the chancellor. What is just to be allowed the master must necessarily depend upon the intricacy of the proof and the complications of law and fact involved in the discharge of the duties of the master in the particular case in hand, and is to be determined by the chancellor sitting as a fair and impartial judge between the master and those who are so unfortunate as to be involved in litigation. The basis should be just compensation for the time which one having the requisite qualifications to serve in that capacity would, in view of the volume of testimony to be considered and of the principles of

law to be applied, necessarily be required to devote in order to reach a conclusion as to the questions of fact and principles of law involved and to place such findings and conclusions in proper shape to present to the court. Members of the bar, masters in chancery, and others having knowledge gained from experience, ought to be able to testify with reasonable certainty as to the time which one learned in the law and qualified to discharge the duties of master in chancery would require in order to become advised as to findings of fact and conclusions as to disputed questions of law in any particular case and to prepare his report thereof to the court. Having knowledge of the time thus required to be devoted to the work, the chancellor could readily arrive at an equitable and just decision as to the amount to be paid, treating the services of the master as being of a nature inferior to those of the chancellor himself and to be compensated for on that basis. The chancellor may, of course, consider the testimony in the light of his own experience and knowledge.

We think that as the report of the findings of fact and conclusions of law presented to the court must be suppressed, the master should not be allowed any fee for services connected therewith. If the report of the testimony submitted by him is by consent of the litigants availed of in the re-reference of the case, the statutory fees for taking and reporting the proof should be taxed in favor of the master.

The judgment of the Appellate Court and the decree of the superior court are each reversed, and the cause will be remanded to the superior court for further and other proceedings in conformity with this opinion.

*Reversed and remanded, with directions.*