**John Bentley, Appellee, v. William J. Ross et al., On Appeal of William J. Ross, Appellant.**

### Gen. No. 15,015.

1. ASSIGNMENTS—*what conduct by assignee will not invalidate.* Held, that the assignment in question in this case which conveyed an interest in the subject-matter of pending litigation to a party who was a material witness in such litigation, was not by virtue of such conduct invalidated, nor was the right of the assignee to enforce such assignment in a court of equity affected by his failure to disclose when on the stand as a witness in such litigation the fact of his interest in the subject-matter thereof.

2. REFORMATION—*jurisdiction of chancery.* It is within the power of a court of chancery to reform an instrument in writing to make it conform to the mutual intent of the parties existing at the time of its execution.

3. MASTERS IN CHANCERY—*when objection to taxation of fees comes too late.* An objection urged to the taxation of the fees of a master in chancery which is first urged in a particular form in the

Appellate Court comes too late and will not be considered, such objection being of a character that if made in the trial court might have been there obviated.

Bill for injunction. Appeal from the Circuit Court of Cook county; the Hon. MERRITT W. PINCKNEY, Judge, presiding. Heard in this court at the October term, 1908. Affirmed. Opinion filed April 18, 1910. Rehearing denied May 2, 1910.

**Statement by the Court.** In March, 1902, complainant Bentley filed a bill alleging in substance that prior to November 11th, 1901, he performed services and expended money for William J. Ross and J. J. Ross constituting the firm of Ross & Ross, who were contractors engaged in the construction of the Sixtyeighth street water tunnel in Chicago; that said firm had brought suit and recovered judgment against said city for $35,000, by reason of their contract for construction of said tunnel; that on the eleventh of November, 1901, said firm executed an assignment in writing to complainant of one-third of their claim in said suit over and above expenses of the litigation; that said firm and the city were negotiating and about to make a settlement of the suit for a sum of money to complainant unknown; that complainant on March 8, 1902, had requested William J. Ross of said firm to give him an order on the city for payment to him of his third of the amount of the settlement in accordance with the assignment; and that while admitting the indebtedness to complainant said Ross refused to give such order. The bill prayed for an injunction restraining the city from paying and the firm of Ross & Ross from receiving the money so due them until the further order of court.

Subsequently an amended and supplemental bill was filed, alleging in substance that in the month of May, 1897, complainant was engaged by defendants Ross & Ross, as superintendent of the said tunnel work under an agreement then made with defendants, by which he was to receive for his services a monthly salary of

$150 and in addition thereto a third interest in the net profits made by defendants under their contract for the construction of said tunnel; that in January, 1898, the city of Chicago attempted to forfeit defendants' contract and took possession of the tunnel; that thereafter defendants began suit in the Circuit Court of Cook county against the city of Chicago, which was numbered general number 180,302; that said suit was an action in *assumpsit* brought for the purpose of recovering from the city the amount claimed by defendants to be due them under their contracts with said city for work and material furnished in the construction of said Sixty-eighth street tunnel; that the trial of said suit began early in October, 1901, and continued until on November 27, 1901, a verdict was returned in favor of defendants for $35,000, and on April 8, 1902, judgment was entered upon said verdict. Complainant avers that under the verbal agreement between him and said defendants, he had a one-third interest in said claim and the proceeds of the said suit, but that no writing had been executed to evidence said agreement; and that while the trial of said suit was in progress becoming dissatisfied because of that situation he requested said defendants to assign and transfer to him his said interest in writing; that thereupon said defendants executed and delivered to him an instrument in writing as follows:

"This Memorandum of Agreement made this 11th day of November, A. D. 1901, between William J. Ross and J. J. Ross, composing the firm of Ross & Ross, contractors, the City of Chicago, Cook County, Illinois, and John Bentley of the same place, Witnesseth:

"Whereas, said Ross & Ross are the owners and holders of a claim against the City of Chicago for damages under a contract between said Ross & Ross and said city for the construction of the 68th street water tunnel, which said claim now in suit pending in the Circuit Court of Cook County, wherein said Ross & Ross are plaintiffs, and the said City of Chicago is defendant, being case Gen. No. 180,301.

"Now, therefore, the said Ross & Ross, for and in consideration of the sum of one dollar and other good and valuable consideration by them, the said Ross & Ross, received of and from the said Bentley, have assigned, transferred and set over, and do hereby assign, transfer and set over to said Bentley one-third of their said claim in said suit, and one-third of any final judgment which may be entered in their favor in said suit and one-third of any settlement or compromise of said claim, meaning and intending hereby that after payment of all court costs, attorneys' and stenographers' fees and expert witness' fees; also, printing of briefs and other necessary expenses and obligations, deducting the same from the amount of the final judgment in said suit or settlement thereof, one-third of the balance remaining shall belong to and be the property of said Bentley, and he may receive and recover the same by suit or otherwise.

"Witness the hands and seals of the parties the day and year first above written.

"Ross & Ross,
"By W. J. Ross."

It is further alleged that when the city of Chicago forfeited its contracts with said defendants in connection with said 68th street tunnel, it took possession of certain machinery, tools and material of said defendants, whereupon the latter began an action in trover against said city in the Circuit Court of Cook county, which was numbered general number 180,301 as complainant now knows, in which last mentioned suit complainant has not and never has had any interest. Complainant avers that the suit in which he was interested was the suit in *assumpsit* on trial in the Circuit Court at the time said written instrument and assignment above set forth was executed, and it was the claim involved in that suit which it was intended should be covered by and described in said written assignment and not the said trover suit; and that it was by mistake or inadvertence on the part of the scrivener by whom said instrument of assignment was drawn, that the general number 180,301 of said

trover suit was erroneously inserted in said instrument, instead of the general number 180,302 of said suit in *assumpsit,* which it was the intention and agreement of the parties the said instrument of assignment should relate to; and therefore the said instrument of assignment should be reformed and corrected so that the general number 180,301 therein mentioned should be changed to 180,302 to accord with the agreement and intention of complainant and defendants. Complainant alleges that by ordinance effective April 9, 1902, the city of Chicago authorized settlement of said defendants' claim at $35,000, a judgment for which amount has been entered in said *assumpsit* suit; that said defendants are insolvent and financially irresponsible, that they pretend complainant has no interest in said judgment and are fraudulently endeavoring to take advantage of said mistake of the scrivener and pretend that it is not the $35,000 fund in which complainant has a third interest, but a fund of $5,000 for which defendants and the city settled the trover suit.

The defendants answering deny the material averments of the bill, allege they received no consideration and were induced to execute the written assignment of November 11, 1901, by threats and intended thereby to convey only an interest in the trover suit.

The cause was referred to a master, who found the issues in favor of complainant. Objections and exceptions of the defendants were overruled and the court entered a final decree reforming the written instrument of assignment so as to correct the number 180,301 purporting to be the general number of the suit referred to therein to 180,302, and decreeing that the city of Chicago in addition to costs allowed pay complainant under the assignment of November 11, 1901, out of the fund in its hands, the sum of $5496.77. From that decree this appeal is taken.

DAVID K. TONE, for appellant.

Mann & Miller, for appellee.

Mr. Justice Freeman delivered the opinion of the court.

It is contended in behalf of appellant, William J. Ross, that the overwhelming weight of the evidence shows it was never agreed to give the complainant a third of the net profits of the tunnel contract, but that the sole reason for executing the assignment of date November 11, 1901, was to secure complainant's testimony in rebuttal and prevent him from assisting the city in the cause then pending.

In a supplemental report the master in chancery to whom the cause had been referred, reported that after a full consideration of all the evidence, he was convinced the testimony of the complainant Bentley was more reliable than that of the defendant Ross, and that the evidence in complainant's behalf was more credible than that offered in behalf of the defendants. He finds that in May, 1897, the defendant Ross verbally agreed with complainant Bentley that if the latter would continue as superintendent of the tunnel work on the 68th street water tunnel Ross would give him $150 a month and one-third of the net profits of the tunnel contract. The testimony of the parties is directly in conflict on this preliminary proposition. Complainant testifies to the effect that he began work for defendants on the 68th street tunnel in the latter part of December, 1896. He was employed as a brick layer. The tunnel was a seven foot water tunnel extending from the shore of Lake Michigan out to a point a little over a mile in the lake. After working as a brick layer two or three weeks he became brick layer foreman and so continued until the fourth of May following, when he became superintendent of the work. At that time he was receiving $7 a day. As superintendent he received $150 a month and his board. The proposition to become superintendent was made to him by a letter signed "W. J. Ross for Ross

& Ross," dated May 4, 1897. In that letter Ross stated that matters had "been going very unsatisfactorily," and that after serious consideration he had decided to offer Bentley "the position as superintendent at the crib at a monthly salary of $150 per month, which may lead to better." The letter expresses the writer's confidence in Bentley's ability to handle the work and says "it is a chance which I think you should embrace;" that Bentley will have absolute control and that he is "authorized to discharge and employ men as it may seem best for the interest of the work;" that the writer realizes "the position means anxiety and responsibility," but that "close attention and looking a little ahead will very much reduce the obstacles which are sure to arise in the conduct of such work." Upon the 20th of May following Ross again wrote Bentley that he decided not to visit the crib "until you had everything going in good working order, so that it could not be said that you did not handle the job wholly yourself." Among other suggestions the writer says "the cheaper work is done, the more encouragement it gives to the contractor to pay such a superintendent the very highest wages; and there is no telling where it will eventually end." Complainant testifies that when the letter of May 4th was delivered by the defendants' bookkeeper, he—Bentley—said he did not want the position of superintendent; that later when defendant Ross visited the crib and expressed satisfaction that complainant had "got everything working in good shape," the latter said, "Now Mr. Ross I have got this job straightened out so it is in good working order and I don't want this position any longer," giving as reasons that the compensation was not enough in the first place, that he could make more money working at his trade, that he had the responsibility, a twenty-four hour day and a big job on his hands; that he could make $9 a day working at his trade, and did not propose to continue as superintendent and have the re-

sponsibility of the job and the worry and excitement, and did not want to continue any longer. Complainant states that Ross then said: "John, I will tell you what I will do. * * * I will give you $150 a month as superintendent. You will get that monthly toward your expenses, and I will offer you one-third of the net profits of this work for your brains and labor." Complainant says he accepted the offer, and he continued as superintendent until about the 20th of January, 1898, when the city undertook to forfeit the contract and took possession of the plant. Defendant Ross denies that any such conversation and agreement occurred. It is argued in his behalf that a careful and prudent man like Ross would not "volunteer to give a man who had not requested it such an extraordinary copartnership contract." There is however no inherent improbability in an agreement to give a third interest in a tunnel contract as compensation for the responsibility and care involved in taking charge of the construction, a work which Bentley had apparently shown himself competent to handle, at a time when previous management had been unsatisfactory at least if not unsuccessful.

The suit brought by Ross & Ross against the city, after the attempted forfeiture of the tunnel contract, came on for trial in October, 1901. The verdict was returned November 27, 1901. A motion for a new trial having been overruled, judgment was entered against the city in April, 1902, for $35,000. While that trial was in progress complainant testified in behalf of Ross & Ross and was deemed an important witness. It was during that trial that the assignment of November 11, 1901, now in controversy, from Ross to Bentley of a third of the claim then in suit was executed. Complainant states that he had a conversation with appellant Ross, and told the latter he was liable to be called to California at any time because of the illness of his daughter who had been sent there for her health; that if he should go, he did not know

when he would return, and that there ought to be a
written agreement between them; that if anything
happened to either of them, he would have nothing
to show his interest in the work. He says Ross agreed
to this and that one McKechney, who appears to have
been assisting Ross in the trial in some way, happening
to approach, Ross asked him "to go ahead and draft
the paper," giving the substance of the paper to be
drafted. The assignment in controversy was the re-
sult. Defendant Ross now claims that this assignment
was extorted from him by threats that if he did not
sign it he would be "thrown in the air" by Bentley
as a witness; that Bentley had said "he was going
to give evidence for the city," and that he signed
upon assurance by McKechney to the effect that it
was necessary to do so for his own protection in the
then pending litigation. It is impossible within ap-
propriate limits to analyze the large mass of evidence.
There is evidence in complainant's behalf tending to
show that appellant Ross at different times and to
different persons admitted that complainant had a
third interest in the fund in controversy. Bentley as-
sisted in the preparation of the case against the city,
and it is claimed by his counsel that his action in this
respect tends to indicate he was in some way interest-
ed in the outcome. He was in court nearly every day
and was in the office of the attorneys for Ross it is said
about a hundred times. He testified three days in
October and again in rebuttal in November. His
testimony as to the alleged verbal agreement with
Ross for a one-third interest is apparently consistent
with expressions in the latter's letters of May 4 and
May 20, 1897. In the former of these letters is the
offer of the position as superintendent at $150 a month,
with the intimation that it "may lead to something
better." In the letter of May 20th, after stating that
the cheaper the work is done "the more encourage-
ment it gives the contractors to pay such a Supt. the
very highest wages," Ross adds, "and there is no

telling where it will eventually end. I am thoroughly convinced that you have the ability to make a success." These expressions indicate that Ross may have had in mind then an offer of something that might be better than the "very highest wages" if necessary to induce Bentley to take the superintendency of the tunnel work, which he writes had "been going very unsatisfactorily" before Bentley took hold. His letters indicate anxiety to retain Bentley's services in that capacity.

On the other hand it is said that at the trial of the tunnel case Bentley gave and intended to give in his testimony and statements an impression that he had no interest in the tunnel litigation. The master found that on the witness stand in that case "he evidently sought to convince the court and jury that he had no interest," but finds that the fact he attempted to conceal his interest in the litigation "may be explained very easily" on the theory that if his interest appeared his testimony would be of much less value. No direct question as to his interest was however put to him on the witness stand and as a witness he made no denial of the fact. That he sought to conceal his interest could not however, as said in Smith v. Cremer, 71 Ill. 185-189, "affect the good faith of the original transaction." It is not claimed Bentley testified that he had no interest; and should any of his testimony in that case be regarded as affecting his credibility as a witness, he was not thereby estopped from asserting in this proceeding such actual interest as he may be able to show.

It is contended "that on November 27, 1901, the appellee by an instrument in writing released appellant from all liability under the Bentley assignment." A written instrument was introduced, purporting to be a release by Bentley of all claims of every kind against defendants, which is claimed to have been executed the evening of November 27, 1901, the date the verdict for $35,000 in the *assumpsit* suit was returned. This alleged release is before us as an exhibit, and

is denounced as a forgery by complainant. It is written in pencil in the handwriting of appellant Ross. It is singular that if signed by Bentley November 27, 1901, it should be dated, as it clearly is, November 27, 1902. The signature alleged to be Bentley's is witnessed by appellant W. J. Ross and his brother, one Kenneth Ross. The instrument is as follows:

"Chicago, Nov. 27th, 1902.

In consideration of Ross & Ross giving me a promissory note for three hundred dollars at three months the same being a cancellation of all claims of every kind which I may have against Ross & Ross, the said promissory note being dated 27th of Nov'r 1902."

This so-called release was produced when Bentley was under cross-examination, and he denied its signature. It is contended by his counsel that the testimony as to the alleged execution of the instrument is demonstrated to be absolutely false. The master finds the instrument was written by Ross, that it was dated in 1902, and was not signed by Bentley. One witness familiar with Bentley's handwriting testified he thought it was Bentley's signature. Two experts on handwriting testified it was not. But the contradictory evidence of the defendants' witnesses who claim to have been present at the alleged execution of this so-called release, the mute testimony of the document itself in the handwriting of defendant Ross, its date of 1902 although it is alleged to have been executed in 1901, the evidence not only of the witnesses but of a time book showing complainant's whereabouts at the time it is alleged by defendants to have been executed by him, the improbability that a man holding a written assignment of a third interest in a verdict for $35,000 against the city, which had been rendered a few hours before, would abandon it under the circumstances alleged, and other evidence not necessary to review at length, tend strongly to justify and confirm the master's finding and to create a conviction that the instrument in question is the

result of an elaborate scheme deliberately planned, involving forgery and perjury, in behalf of appellants. In this connection reference may be had to an instrument introduced in behalf of complainant by the witness McKechney, who testified that it was written by defendant Ross prior to the execution of the assignment of November 11, 1901, to express, as Ross is said to have claimed, more exactly the intention of the parties. It is said to have been written by appellant Ross while the assignment was in preparation and to have been left by him on the table where it was found and retained by McKechney, to whom the preparation of the assignment had been intrusted. Appellant Ross denies that he wrote this memorandum. If in fact written by him it tends to show that his testimony to the effect he had nothing to do with suggesting the terms of the assignment in controversy is untrue. The master finds the memorandum to be in the handwriting of appellant Ross and we are of opinion the great preponderance of the evidence justifies the conclusion. The memorandum is as follows:

"We agree to pay John Bentley 1-3 of any amount which may be due Ross & Ross after final judgment in the final court of resort. Certain obligations & undertakings have already been entered into by Ross & Ross and it may be found necessary to enter into further obligations and undertakings to carry the suit through to a final settlement, and after payment of said obligations and undertakings the remaining amount shall be divided 1/3 John Bentley, 2/3 Ross & Ross, and it is further agreed that this agreement shall be held in the custody of Mr. John McKechney of the City of Chicago as trustee, until a final adjustment is had."

If written by Ross the memorandum is inconsistent with his assertion that the assignment of November 11, 1901, was executed merely for the purpose of securing the testimony of the complainant in the *assumpsit* suit against the city and without consideration.

It is urged the decree "should be reversed because

it was awarded upon a finding of facts contrary to and different from the facts alleged in the bill." We do not concur in this contention. The bill alleges that complainant had a third interest in the claim set up in the *assumpsit* suit in the Circuit Court, and that it was the claim in that suit which complainant and defendants alike intended and agreed should be "covered and described in the instrument of assignment." Inasmuch as by the terms of the written assignment defendants Ross & Ross assigned and transferred "to said Bentley one-third of their said claim in said suit and one-third of any final judgment which may be entered in their favor in said suit and one-third of any settlement or compromise of said claim," this contention of the bill is sustained in this respect by the written instrument. If that instrument was intended to embody literally the alleged previous verbal agreement, it does not say so. It superseded the verbal arrangement, but its purpose and object appear to have been substantially the same, and it must be deemed to express the final agreement and understanding of the parties. The amended and supplemental bill seeks to enforce the lien of the written assignment. We are unable to concur in appellants' contention that it was incumbent on complainant "to allege and prove that the tunnel contract was completed at a profit."

In view of the conclusion above stated, it is unnecessary to review the evidence relating especially to the error in the assignment by which the number of the trover suit of defendants against the city was inserted in the assignment instead of the number of the *assumpsit* suit. It clearly appears that this was a mistake from the wording of the assignment itself, which relates by its terms to the claim of defendants for damages under the contract for the water tunnel. The trover suit was not a claim under that contract. There is no error in reforming the assignment in this respect, as was done.

It is urged that the court erred in taxing master's fees against appellants. The decree finds that $1016.50 was "a fair and reasonable compenstion for the services rendered by the master;" that of that sum $550 had been paid the master by complainant and the balance by defendant Ross, and that complainant is entitled to recover the $550 paid by him as part of his costs in the case. · The ground of the objection is stated to be that "the master did not transmit with his report an itemized statement of his services * * * and the only evidence upon which the decree in this cause with reference to the master's fees was entered was a certain conversation which took place between counsel for the parties at the time the decree was proposed and prior to its entry." No other objection is urged in this court, and this objection was not made before the chancellor. The conversation referred to was in substance a statement of matters as to which counsel on both sides agreed, and was in the nature of a stipulation. The record in the cause shows 1274 pages of testimony taken before the master. The statutory fee for this testimony would apparently be about $522.34. This would leave a balance of $494.16 allowed the master for the work involved in analyzing the conflicting evidence, the arguments of counsel and preparing the reports. It is said in Gottschalk v. Noyes, 225 Ill. 94-101, the chancellor was able to determine from an inspection of the report what fees would be reasonable for the master's work "and it was not necessary to produce evidence." It is true however that this record does not show that the master itemized his charge and therefore does not "show the time he was necessarily employed in the examination of questions of law and fact and in preparing his report of such findings and conclusions" (Fitchburg Steam Engine Co. v. Potter, 211 Ill. 138), as it should have done. In such cases the Supreme Court has said (Wirzbicky v. Dranicki, 235 Ill. 106-115) that it will not "enter upon an independent examination of his

report for the purpose of attempting to state correctly the items covered by the charge, the time given by the master to each service and the amount that should be allowed on account of each, in order that he may be decreed the sum that could properly have been allowed him had he complied with law in reference to stating his claim.    In such instances nothing will be allowed by us on account of services covered by the gross charge.''    The objection to the master's fee urged before the chancellor was that the fees charged were excessive and unreasonable.    That point is not urged here and is therefore waived.    Dunn v. Crichfield, 214 Ill. 292-299; McCarthy v. Neu, 91 Ill. 127-131.    Had the objection that the master did not present an itemized statement been made before the chancellor the omission doubtless would have been cured then and there.    The contention raised in the Circuit Court that the charge of the master was unreasonable and excessive having been waived and abandoned in this court, the objection that no itemized statement is furnished becomes purely technical.    The object of such itemized statement here is to enable us ''to state correctly the items covered by the charge'' (Wirzbicky v. Dranicki, *supra*), and there is no necessity for such examination and statement except when we are called on to determine whether the charge is excessive.

In view of conclusions stated we deem it unnecessary to discuss other and minor points referred to in the briefs.    For the reasons indicated the decree of the Circuit Court will be affirmed.

*Affirmed.*