THE LESLIE E. KEELEY COMPANY, Appellee, vs. FREDERICK
B. HARGREAVES et al. Appellants.

Opinion filed October 26, 1908—Rehearing denied Dec. 2, 1908.

1. APPEALS AND ERRORS—when a freehold is involved. Where
a bill for injunction prays for a decree setting aside a deed as in-
cidental to the main relief and the decree sets aside the deed, there-
by canceling the title of the defendant, who claimed title through
the deed in his answer to the bill, a freehold is involved, regard-
less of whether the claim of the defendant under the deed was well
founded or not.

2. SAME—the granting of a preliminary injunction cannot be
assigned for error on appeal from final decree. Upon appeal from
a final decree making a preliminary injunction perpetual the grant-
ing of the preliminary injunction cannot be assigned for error,
since in reviewing the final decree it is immaterial whether a pre-
liminary injunction was granted or not, or, if so, whether it was
granted rightfully or wrongfully.

3. SAME—matters happening after appeal is taken are not open
for review. The action of the court upon motions made after the
final decree has been entered and an appeal has been prayed there-
from are not open for review, since an appeal from a final decree
brings up nothing happening after the taking of the appeal.

4. CONTRACTS—an assignment of right to use a secret formula
need not be in writing. An assignment of the right to use a secret
formula need not be in writing, and a verbal transfer thereof by
the owner for valuable consideration, under which there has been
a long continued use under claim of ownership acquiesced in by
the original owner, is sufficient to transfer the owner's right.

5. INJUNCTION—when use of knowledge of secret formula will
be enjoined. One who acquires his knowledge of a secret formula
by reason of his being in partnership with the discoverer of the
formula, and who is bound by agreement not to divulge it, has no
right to make use of the formula after selling his interest in the
business, and the use of such knowledge by himself and third per-
sons for the purpose of engaging in a competitive business will be
enjoined.

6. SAME—what is not such fraud by complainant as precludes
relief. The fact that a corporation having the exclusive right to
use a secret compound continues, after the death of its president,
who was the discoverer of the remedy, to use labels having a fac
simile of his signature, which was intended to identify the com-
pound as the genuine product of the corporation, is not fraud which

will preclude the corporation from coming into a court of equity to enjoin the use of the secret compound by third persons.

7. LACHES—*when partner is barred by delay from attacking his transfer of interest.* One who has acquiesced, without objection, for a period of eighteen years, in the dissolution of a partnership and the transfer of his interest to the other partners will not be permitted to urge that he was forced out of the business in ignorance of his rights under the partnership agreement, where it does not appear that he was denied the right to examine the agreement or that his opportunity for knowing its contents was less than that of the other parties.

8. MASTERS IN CHANCERY—*the master's findings must be based upon his own impartial investigation.* The findings of the master must be based upon his own impartial investigation of the evidence and the law rather than upon sets of findings submitted to him by counsel for the respective parties; but if the action of the master in permitting counsel to submit suggestions of the findings which they think should be made is taken at their suggestion, they cannot complain of such action on appeal. (*Fitchburg Steam Engine Co.* v. *Potter,* 211 Ill. 138, distinguished.)

APPEAL from the Circuit Court of Livingston county; the Hon. T. M. HARRIS, Judge, presiding.

W. H. KETCHAM, and CLYDE H. THOMPSON, (STRAWN & STRAWN, of counsel,) for appellants.

R. S. McILDUFF, and B. R. THOMPSON, (CHARLES E. PICKARD, of counsel,) for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

This appeal is from a decree making perpetual an injunction against the defendants in a bill filed by the appellee, the Leslie E. Keeley Company, against Frederick B. Hargreaves, the Fred. B. Hargreaves Company, and others.

The bill alleged the incorporation of the complainant under the laws of Illinois, having its principal place of business at Dwight, in Livingston county; that Leslie E. Keeley, a practicing physician, about 1880 discovered a new remedy for drunkenness and similar diseases and began to administer the same; that about 1881, for the purpose of

carrying on and developing the business in connection with said remedies, a partnership was formed between the said Keeley and Curtis J. Judd, Frederick B. Hargreaves, John R. Oughton and James Halpin, with written articles of co-partnership, whereby it was, among other things, expressly provided that each member of the firm should jealously guard all information pertaining to the compounding of said remedies, their constituent parts and elements, and should under no consideration divulge any information whatever concerning their manufacture to anyone; that if any partner should so impart any of said information his connection with said business should immediately determine; that if any partner sold his interest he agreed to keep secret all his knowledge of and concerning the nature and manufacture of said remedies, and not to divulge any of such knowledge to anyone whatsoever without the written consent of all of the then surviving partners; that to the said Oughton, as a pharmacist, was confided the preparation and ingredients of the secret remedies, and the secret was imparted to him by Keeley, as a secret and confidential communication, for that purpose; that the remedies were administered to a large number of patients, the treatment became very successful and the remedies acquired a great reputation; that about March 20, 1886, the connection of the said Frederick B. Hargreaves with the partnership was severed, and for a valuable consideration he by an instrument in writing sold all his interest (except the accounts, notes, two deeds and one mortgage,) in the said partnership to the said Judd for the use of the remaining members; that afterwards, by two certain instruments in writing, the first about January 7 and the second about September 26, 1887, he sold to the Leslie E. Keeley Company all his interest in the matters excepted from the first transfer; that about March 25, 1886, Halpin sold his interest to the remaining partners; that about April 3, 1886, the complainant corporation was duly incorporated, and Keeley, Judd and

Oughton, the sole remaining partners, became the sole sub-
scribers to its capital stock, and in payment therefor gave
over and sold to the corporation the entire assets, good will
and business of the co-partnership, together with the right
to make, administer and sell the said secret remedies discov-
ered by Keeley; that complainant continued the business,
which grew rapidly and is of great value to the complain-
ant; that the objects for which the corporation was formed
were enlarged, branch institutes were established at various
places, and the secret remedies were sold by complainant to
them and administered there by skilled physicians instructed
under the direction of Keeley during his lifetime and since
his death by other physicians instructed by him or by others
in complainant's employ; that the complainant became the
owner of certain real estate described in the bill; that Kee-
ley died February 21, 1900, and since his death the medical
direction of the business has been supervised and the ad-
ministration of the secret remedies directed by physicians
regularly licensed and instructed in the administration of
the said remedies; that from the time of the discovery
the secret of the remedies has been jealously and carefully
guarded, and, aside from the good will, is the chief and
most valuable asset of the complainant, and if it should be
made public the business of the complainant would be de-
stroyed; that Frederick B. Hargreaves has given out that
he knows the secret of the remedies as prepared by Keeley
and by the co-partnership, and became so acquainted with
it while associated with Keeley and a member of the co-
partnership; that defendants have entered into a conspiracy
wrongfully to use said Hargreaves' alleged knowledge of
the secret remedies, and to that end have formed a corpo-
ration to sell and administer such remedies; that said Har-
greaves is to disclose his alleged knowledge of the secret
remedies, and proposes to sell to defendant company reme-
dies made in accordance with the secret formulæ used by
Keeley, the partnership and complainant, the knowledge of

which he claims to have; that defendant company proposes
to purchase of said Hargreaves such remedies and to sell
and administer the same; that said Hargreaves has con-
tracted to give the company his exclusive services in the
preparation of such remedies, the knowledge of which he
gained, if he possesses it, while associated with Keeley and
the co-partnership; that defendants are about to open at
Dwight an institution for the preparation and administra-
tion of such remedies compounded under said Hargreaves'
direction, and to offer and sell such remedies to others and
to so-called Keeley Institutes at a lower price than sold by
complainant; that said Hargreaves and wife, in pursuance
of said conspiracy, have conveyed to William H. Ketcham
an undivided interest in certain property now owned by the
complainant, which constitutes a cloud on the complainant's
title; that the defendants pretend that said Hargreaves has
some interest in complainant's business, and is at liberty to
sell the secret acquired while associated with Keeley and to
prepare and sell remedies compounded in accordance with
the secret formulæ used by Keeley, but complainant alleges
that if said Hargreaves does know the secret formula, or
has any material knowledge of it, he obtained it wholly
through his confidential relations with Keeley and by rea-
son of his being a co-partner, and would therefore, after
having sold his interest in the co-partnership, be debarred,
in equity and good conscience, from ever thereafter using
the same for his own benefit or the benefit of any other
person than complainant.

The bill prays for an injunction restraining the said
Frederick B. Hargreaves from disclosing to his co-defend-
ants, or any other person, any knowledge acquired, directly
or indirectly, from the said Keeley, or by reason of Har-
greaves' membership in the said co-partnership, as to the
composition, formulæ or methods of compounding the said
remedies, and from making remedies in accordance with
the knowledge derived, directly or indirectly, from the said

Keeley or while a member of said partnership, or from advertising that he will make such remedies, and restraining the other defendants from selling or administering such remedies and from disclosing any information which they may have derived from Hargreaves in regard to them; also restraining Ketcham from setting up any claim, by virtue of the deed from the said Frederick B. Hargreaves to him, to the real estate therein described, and restraining both Ketcham and Hargreaves from making any conveyance of any interest therein, and for a decree that the conveyance from said Hargreaves to Ketcham of the said real estate be set aside as a cloud upon the complainant's title.

Separate answers were filed by the various defendants putting in issue the allegations of the bill. The claim of the defendants is, that the discovery of the remedies mentioned in the bill was not made by Dr. Keeley, but was made by Dr. Keeley and Frederick B. Hargreaves jointly; that they together prepared, compounded and administered the remedies and began to place them on the market pursuant to a verbal agreement between them, and that later the partnership mentioned in the bill was formed, its name being afterward changed to "The Leslie E. Keeley Company," but that Hargreaves never transferred or parted with his interest in the formulæ for the preparation of said medicine. The answers deny that Hargreaves' connection with the partnership was severed in March, 1886, or that he assigned his interest to Judd for the other partners, but aver that Hargreaves was at that time forced by Keeley to retire from active participation in the business of the partnership. The incorporation of the defendant is neither admitted nor denied, but it is averred that notwithstanding the alleged incorporation the co-partnership continued to do business under the same name and in the same way as before, under the management of Keeley, Judd and Oughton, three of the partners, until the death of Dr. Keeley, in 1900; that the real estate described in the bill was purchased with

the profits of the partnership business, the title was taken in the name of the partnership and Hargreaves was entitled to his proportionate share thereof, namely, two-tenths. The answers also charge that the complainant, in the conduct of its business, practices fraud upon the public by representing the remedies sold by it to contain gold, when, in fact, they do not contain gold; by falsely representing its remedies to have been put up under the personal supervision of Dr. Keeley, long after his death, and by using the name of Dr. Keeley on the labels put upon the bottles in which the remedies are sold, without stating that he is dead.

A motion was made to transfer the cause to the Appellate Court for the Second District on the ground that no freehold is involved, and was taken with the case. The bill prays for a decree setting aside the deed from Hargreaves to Ketcham. Ketcham's answer claims title through that deed, and the decree sets it aside. The assignments of error question the sufficiency of the allegations of the bill in regard to the real estate and the appellants' argument very briefly mentions the point. The relief is, of course, incidental to the main purpose of the bill, but the effect of the decree was absolutely to cancel Ketcham's title to the land in which he claimed a freehold. His claim may have been ill-founded, but it was a claim of freehold, and in such case an appeal properly lies to this court. The motion to transfer the cause will therefore be overruled.

The first assignments of error are directed against the action of the court in granting a preliminary injunction without notice and without sufficient verification of the bill, and various alleged defects in the bill are suggested. The granting of a preliminary injunction cannot be assigned for error. (*Tunison* v. *Chamblin,* 88 Ill. 378.) It is merely interlocutory, and is open to review only upon an appeal taken in the manner provided in the act to provide for appeals from interlocutory orders. (3 Starr & Cur. Stat. 3171.) The injunction was made perpetual by the final

decree, and in the review of that decree it is immaterial whether or not a preliminary injunction was issued, or, if it was, whether it was rightly or wrongly issued.

The first question of material importance in the case is whether the discovery of the remedies involved in the controversy was made by Dr. Keeley alone, or by Dr. Keeley and Frederick B. Hargreaves acting together.

The evidence shows that Dr. Leslie E. Keeley came to Dwight in 1866 and began the practice of medicine. The record discloses nothing of his life before that time except that he was a native of Ireland, was a graduate of the Rush Medical College in 1864, and, according to his own statement, was a surgeon in the Union army during the civil war. He was successful in his practice and acquired a good reputation in the community as a physician and also as a man of intelligence and of education. He was the physician of the Chicago and Alton Railroad Company. In the army he had seen much drunkenness and he became interested in seeking a remedy for it. He regarded it as a disease rather than a vice and frequently discussed it, giving his views and telling of his efforts towards finding a remedy for the disease and of his belief that he had discovered such a remedy. He lamented, also, the insufficiency of means at his command to launch his remedy on the market and sought financial aid for that purpose. His conversations of this character are testified to by numerous witnesses, most of them entirely disinterested, covering a period of at least ten years prior to 1880. Dr. Keeley experimented with his remedy before 1880 upon a man by the name of Miller, also upon James Martin and John Campbell, and the experiment was successful in the case of Martin and at least for a time in the other cases. The testimony leaves no doubt in the mind that for many years prior to 1880 Dr. Keeley was deeply interested in the question of a medical cure for drunkenness; that he had investigated the subject and made experiments; that his experiments were

partially successful; that he believed he had discovered the remedy he sought and wanted to get it into general use but lacked means for that purpose.

Campbell took the cure late in 1879 or early in 1880. It is at this point that Frederick B. Hargreaves comes into the case. He was born in London, England, in 1847 and lived in various places in that country until he was twenty-five years old, when he came to this country. During the last two or three years he lived in England,—though he cannot say accurately how long,—he was a minister of the gospel of the Wesleyan denomination. On coming to this country, in 1872, he lived first at Gardner, a few miles north of Dwight, where he staid about fifteen months and was pastor of the Presbyterian church. He then went to Dwight and was pastor of the First Presbyterian church there a few months, after which, while still living at Dwight, he became pastor of the Presbyterian church at the Pound school house, six miles south of Dwight, in the next township. He soon left this church on account of his drinking, and after that practiced law in justices' courts at Dwight, having never studied law or been admitted to the bar. In 1877 he went on the lecture platform, and was later vice-president of the Illinois State Temperance League and continued a lecturer until 1880, when his association with Dr. Keeley in a business way began. Hargreaves' account of this beginning is, that his mention to Dr. Keeley of the case of Dr. Dodd, with whom they were both acquainted, brought out the fact that they were both acquainted also with one thing that was said to be a sure cure for the whisky habit. Later Keeley told Hargreaves he had tried the cure and had good results. Hargreaves being skeptical they then agreed to make a test by trying the remedy on a saloon-keeper in Dwight, who took it and was temporarily benefited. Hargreaves, being satisfied with this test and sure the remedy was a good thing, urged putting it upon the market as a patent medicine, but Keeley, having re-

gard for his professional reputation, was unwilling to do so. While the matter was under discussion Dr. Keeley treated Campbell's case, and after his recovery Campbell was taken into the business, and he and Hargreaves went to Bloomington to get it started. They were gone several weeks, during which time they treated a sewing machine agent named Dalibi, advertised the remedy, and Hargreaves wrote circulars, letters and newspaper articles for this purpose.

After the return of Campbell and Hargreaves to Dwight, Dr. Keeley and Hargreaves bought Campbell's interest. Hargreaves wrote, and in April, 1880, published, "A Review of Dr. L. E. Keeley's Recent Discovery of the Chloride of Gold Cure for Drunkenness," which he signed as vice-president of the Illinois State Temperance League, in which he described Dr. Keeley's researches and experiments extending over a period of fifteen years, and stated that Dr. Keeley had, as a result of his persistent effort, discovered this remedy. He testified in this case that the statement was untrue and Dr. Keeley's army experience as therein stated mythical; that he objected because the statements were not true, but Dr. Keeley overcame his scruples by saying it was Keeley's personal statement and he alone was responsible for it, and therefore Hargreaves would not be incriminated by it. Hargreaves also testified that the sanitary and dietary regulations were prepared mostly by himself, and that in the preparation of the opium cure he did the investigating; that both he and Dr. Keeley were very ignorant on the subject; that he got the literature and medical works, read them very fully, made a careful study of the subject, and at night or when driving with Dr. Keeley gave him a resume of what he (Hargreaves) had thought out and studied. Later, when it was thought advisable to have in the advertising literature a pathology of inebriety, Dr. Keeley said he knew nothing about it and could not write one. Therefore arrangements were made with Dr.

Romaine J. Curtis, of Joliet, who wrote the pathology and
sent it to Dr. Keeley, who turned it over to Hargreaves.
The latter adapted it for publication and it was published. .
Hargreaves claims to have known all the formulæ for the
preparation of all the remedies from the times of their re-
spective origin; that he was the leading spirit in the in-
vestigation of the subject and in starting and pushing the
business of putting the remedies on the market; that his
knowledge of and interest in them was the same as that of
Dr. Keeley, and that the latter did not discover the reme-
dies, as alleged in the bill.

Outside Hargreaves' own testimony there is very little
evidence in the case tending to sustain this position.  There
is a mass of evidence from the other partners and the em-
ployees during the time prior to 1886, when his participa-
tion in the business ceased, that during that time, while a
partner in the firm, his duties, as those of the other part-
ners, were entirely subordinate and under the direction, in
every particular, of Dr. Keeley, who controlled the business
as if it were his own.  The articles of partnership them-
selves provided that Dr. Keeley should have general control
of the business, with power to determine any partner's con-
nection with the business for a violation of the covenants of
the agreement or for neglect of duty.  Mr. Oughton, who
was a pharmacist in the drug store of Mr. Seymour in
Dwight in 1879, was employed by Dr. Keeley to prepare
the remedy used in Campbell's case, and has ever since been
engaged in the preparation of the various remedies used
and sold by the appellee.  He has been the president of the
corporation since Dr. Keeley's death.  He knows the for-
mulæ used in the compounding of the remedies sold by
appellee and says that he received them from Dr. Keeley
alone; that during Hargreaves' connection with the part-
nership he had nothing to do with putting up the medicine
and knew nothing about it; that he wrote the letters and
circulars under the direction of Dr. Keeley and did what-

ever the doctor directed him to do. The testimony of Mr. Judd, who has been a partner and stockholder since 1881, is to the same effect, and so of all who had opportunity to observe and know the relation of Hargreaves to the business. Hargreaves in his writings represented the discovery of the cure as Dr. Keeley's alone, and many witnesses testify to frequent conversations, in Hargreaves' presence, in which Dr. Keeley gave an account of his investigations of drunkenness while in the army and afterward, and of his experiments and the discovery of his remedy. No claim was ever heard from Hargreaves until shortly before the beginning of this suit, either that he was acquainted with the formulæ for the preparation of Dr. Keeley's remedies or that he had had a part in the discovery of them. Hargreaves denies all these conversations of Dr. Keeley in his presence in regard to the discovery of the remedies, and in so doing contradicts a number of apparently credible witnesses. He also testifies that Dr. Keeley feared that it would injure his professional reputation to be known in the business, and it was therefore agreed that he should be known in it professionally only, and should have all the credit of the discovery but that Hargreaves should look after the commercial part of the business, yet from the beginning the business was conducted in the name of Dr. Keeley alone, and the articles of co-partnership entered into in 1881 placed him in sole and absolute control of the business in every department.

It is impossible to discuss in greater detail, within reasonable space, the very voluminous evidence contained in this record. It is convincing that there is no foundation for the claim that Frederick B. Hargreaves had any connection with the discovery of the remedies put forth under the name of Dr. Keeley. The circumstances of his education, occupation, reputation and conduct, as well as his written and oral statements, are at variance with the claim he now makes. Our attention is called to the fact that the bill required the answers to be under oath and that they are

sworn to. Giving the defendants all the advantage in regard to the evidence to which their sworn answers entitle them, no other conclusion than that we have stated can be reached upon this issue.

It is very earnestly argued in behalf of appellants that appellee does not come into court with clean hands, and that it was, at the time of filing the bill, itself engaged in deceiving the public by representing, through the labels placed upon the bottles in which its remedies were sold, that gold was one of the elements entering into such remedies. It is also claimed that the labels used upon the bottles when the bill was filed, four years after Dr. Keeley's death, contained the statement that the remedies contained in such bottles were prepared under Dr. Keeley's personal direction, which was manifestly untrue. It is claimed, also, that it was a fraud to use the *fac simile* of Dr. Keeley's signature on the bottles without stating that he was dead. There is no doubt about the position that a false representation as to the ingredients of which a remedy is composed or the manufacturer by whom it is made will constitute such a fraud upon the public as will deprive the person employing such false representation in his business of the protection of a court of equity against unfair competition in such business. A court of equity will not enjoin the fraud or unfair competition of rivals in business in order that a complainant guilty of such misrepresentation may have a monopoly in deceiving the public. The trouble with the application of the rule in this case is that the evidence does not show such a situation. Counsel for appellants argue this proposition as their foremost proposition in this court, but they do not refer to a single item of evidence sustaining their contention of fact. We have found that labels were introduced in evidence containing the representations complained of, but the evidence does not show that such labels were in use at the time of the commencement of this suit. The *fac simile* of the autograph of Leslie E. Keeley

was used by complainant on its bottles for many years before the death of Dr. Keeley, during all which time he was president of the corporation. It was merely a means of identification, and the continuance of its use after his death was not fraudulent. It could not be regarded as a representation of any fact in connection with the contents of the bottle further than that it was the genuine product of the Leslie E. Keeley Company.

It is insisted that the bill fails to allege and the evidence fails to show that the complainant ever acquired, or now owns, the rights of Keeley and Hargreaves, or either of them, in the formulæ for the remedies in question. The bill alleges and the proof shows that after the formation of the partnership, the firm, through Oughton, one of the partners, compounded the remedies, making use of the formulæ given to him by Dr. Keeley; that Hargreaves sold and assigned to the other partners all his interest in the partnership, as did Halpin also; that immediately after the dissolution of the partnership, occasioned by the withdrawal of these two partners, the complainant corporation was formed, and Keeley, Judd and Oughton, the three remaining partners, who had succeeded to all the assets, business and good will of the partnership, subscribed for all the capital stock of the corporation, and in payment therefor sold and gave over to the complainant the entire assets, good will and business of the partnership, including the right to make, administer and sell the remedies discovered by Keeley. We have held that the proof shows that the remedies were discovered by Keeley. The formulæ for their compounding were his. They were not assigned to complainant by any instrument in writing, but the testimony is clear that they were actually given over to the complainant for its use and benefit and in payment for its capital stock, and for many years the complainant, while Dr. Keeley was its president, with his consent, under the claim of rightful ownership knowingly acquiesced in by him, has been using these

formulæ as the most valuable part of its property. The law does not require the assignment of such property to be in writing. In this case there was a verbal transfer by the owner for a valuable consideration, under which there has been a long continued use under a claim of ownership acquiesced in by the original owner, and this is amply sufficient to transfer the owner's right.

Appellants have not contended that an injunction should not be granted if Hargreaves obtained his information from Dr. Keeley by reason of the opportunities presented by his relation to the business as a partner and if he was bound by an agreement not to divulge it. We have seen that his information, if he has any, was so acquired and that he was bound by contract not to divulge it. Dr. Keeley's rights in the knowledge having become the property of the complainant, it holds those rights exclusively, as did Dr. Keeley, and the defendants have no greater right to use the knowledge of Hargreaves, if any, to the detriment of complainant, than to the detriment of Keeley.

It is contended that Hargreaves was unjustly forced out of the partnership by Keeley, and that therefore his rights therein were not cut off and the partnership was not dissolved. By two instruments executed by him voluntarily long after Dr. Keeley terminated his connection with the firm, Hargreaves transferred to the firm every kind of remaining interest he might have therein. He says he supposed under the partnership agreement Dr. Keeley had a right to terminate his interest, and that there was only one copy of the agreement, and that was kept in the safe, so that he could not examine it and learn his rights. There is no evidence that he ever asked to see this agreement. His opportunity for knowledge of it was the same as that of the other partners, and no doubt he would have been permitted to examine it had he requested an examination. He acquiesced for eighteen years in the dissolution of the partnership and the transfer of his interest therein to the

other partners, and his neglect now bars him from saying that he was ignorant of his rights.

It is also said that the organization of the complainant corporation and its subsequent proceedings were irregular and that the business conducted by the corporation was really but a continuation of the partnership business, and therefore the complainant corporation cannot maintain this suit. So far as the appellants are concerned, the regularity of appellee's organization or proceedings is of no importance. But the record shows an organization regularly had. Whether proper records have been kept or not, whether appellee had the right to take a conveyance of real estate or not, does not concern the appellants, and the large volume of evidence taken upon questions concerning the organization and proceedings of the appellee uselessly encumbers the record. The same may be said of the evidence concerning Dr. Keeley's will and the administration of his estate.

Objection is made to the admission of Dr. Keeley's statements in regard to his investigation of the causes and cure of drunkenness on the ground that they were hearsay. So far as these statements were mere narrations of past occurrences the objection is well taken. Most of these statements, however, were repeatedly made in Hargreaves' presence and were admissible for that reason. Many of them were statements made concerning his work of investigation then in progress or cases then under treatment, and were admissible as parts of the *res gestæ* or for the purpose of fixing the time of his investigation with reference to his relations and acquaintance with Hargreaves. Without regard to what was improperly heard, the other evidence was amply sufficient to justify the decree that was rendered.

Objection was made to the alleged action of the master in permitting appellee's solicitor to prepare the findings contained in his report. Evidence was heard by the chancellor, and the master testified that at the conclusion of the taking of the evidence appellants' counsel suggested

that he would like to submit findings which he thought the master ought to report to the court. Thereupon the master stated that if both sides were satisfied they might file with him suggestions of what they thought ought to be found, and it was then agreed that both sides should do so. Both sides did so, and the master having the prepared findings of each party before him, prepared his findings in accordance with his own consideration of the evidence and made his report accordingly. A master should arrive at his conclusions from his own impartial investigation of the evidence and the law, rather than from the consideration of two ready-made sets of findings presented to him by the contending parties. But the method adopted by the master was taken at the suggestion of appellants and they can not now complain of the course adopted at their suggestion. The case is unlike that of *Fitchburg Steam Engine Co.* v. *Potter,* 211 Ill. 138, where a complete report prepared by the counsel for one party was, without the knowledge of the other, accepted by the master and presented as his own. Here both parties agreed to and participated in the course pursued. No unfair or improper motive or act on the part of the master is alleged. The findings are his findings. The evidence sustains them, and improper conduct is not shown on the part of the master to justify setting aside his report.

Irregularity is also claimed in the appointment of a special master in the case and in the making of an order of reference therein by Judge Patton, from whom a change of venue had been before granted. The taking of testimony under this order and before the special master was continued from time to time for several months. No question was ever made as to the regularity of his appointment, and no objection was ever made to his acting as special master until after the final decree was rendered and the defendants had prayed an appeal. Then a motion was made by the defendants to set aside all the proceedings subse-

quent to the order of reference, because the master, U. W. Lowderback, was not the legally appointed regular master, and because Judge Patton had no authority to enter the order continuing him as special master after a change of venue had been taken from him. This motion was overruled and no appeal was taken from the order overruling it. This order is not before us for review. The appeal is from the final decree and brings up nothing happening after the taking of the appeal.

The decree of the circuit court will be affirmed.

*Decree affirmed.*