## RECAMIER MFG. CO., Inc., v. HARRIET HUBBARD AYER, Inc.

District Court, S. D. New York.
April 13, 1932.

804

Breed, Abbott & Morgan, and Charles H. Tuttle, Arthur A. J. Weglein, and Isaac Reiss, all of New York City, for plaintiff.

Redding, Greeley, O'Shea & Campbell, and Charles Neave, Worthington Campbell, and Ernest W. Marlow, all of New York City, for defendant.

PATTERSON, District Judge.

. The plaintiff brought this suit for infringement of a registered trade-mark, and the defendant filed a counterclaim for similar relief. The trade-mark in dispute is "Harriet Hubbard Ayer" written in script form, for use on toilet articles. The plaintiff claims that its right to the trade-mark goes back to 1886, while the defendant traces a use beginning in 1907.

The plaintiff's line of succession is Harriet Hubbard Ayer (1886–1887), Recamier Manufacturing Company (1887–1896), Maria E. Rinn (1896–1920), Anna E. Reynolds (1920–1931), and the plaintiff. As early as 1886 one Harriet Hubbard Ayer sold a face cream called Recamier cream, made under a secret formula claimed to have come down from Madam Recamier, a famous beauty. In that year she filed an application for registry of trade-mark. Included in the application was a drawing. The drawing showed at the top the words "Recamier Cream"; next came a crest; at the bottom there was a facsimile signature "Harriet Hubbard Ayer." In the description of the mark, however, the applicant made this statement:

"My trade-mark consists of the word-symbol 'Recamier' and a crest composed of fasces surmounted by a coronet, out of which rises the head of a lion. These have generally been arranged, as shown in the accompanying facsimile, in which the word 'Recamier' with the word 'Cream' following it are in block capital letters, and arranged in the form of an arch over the said crest, and the facsimile of my signature is arranged below the said crest; but the style of lettering is unimportant, and the word 'Cream' and the signature may be omitted without changing the character of the trade-mark, the essential features of which are the arbitrary word 'Recamier' and the crest composed of fasces surmounted by a coronet out of which rises the head of a lion."

The following year Mrs. Ayer assigned the trade-mark, along with other property used in the business, to Recamier Manufacturing Company, a New York corporation, but not the plaintiff in this case. Mrs. Ayer owned stock in the corporation and was actively connected with it. In the instrument of assignment, she described the mark as "consisting of the word symbol 'Recamier' and a cross (sic) composed of fasces surmounted by a coronet out of which rises the head of a lion." The Recamier Company continued the manufacture and sale of Recamier Cream, and it also manufactured and sold other toilet preparations. The word "Recamier" and the crest, as well as the facsimile signature, were placed on practically all products, the signature sometimes in juxtaposition to the crest and sometimes at other places on the box or bottle. Stress was laid on the fact that no products were genuine without the signature, and Mrs. Ayer's connection with the business was emphasized in many ways. For some years an extensive business was carried on and a great deal of advertising indulged in.

In 1896 the Recamier Company found itself insolvent. At a receiver's sale in October, 1896, all the corporate assets, including trade-marks and good-will, were sold for $4,000 to Maria E. Rinn, formerly an employee of the company. Miss Rinn thereupon continued the business under the trade-name of Recamier Manufacturing Company. For a time she went on using the Harriet Hubbard Ayer signature on the products. In 1897 Mrs. Ayer brought suit to put a stop to the use of her name in the business. This suit was dropped upon Miss Rinn's affidavit to the effect that she had discontinued using the Ayer name. Mrs. Ayer, having been unsuccessful in business, took up lecturing and writing beauty articles for newspapers. She died in 1903.

The business was carried on by Miss Rinn until 1920, when she sold out to Miss Reynolds. During this period of twenty-four

years, she sold creams and cosmetics made by the old formulas, under the old Recamier name and crest. Sales seem to have gradually dwindled away. The evidence is conflicting as to her use of the Ayer signature. A witness who has worked for the old company and also for Miss Rinn stated that use of the signature was resumed in 1902 or thereabouts. Several other witnesses for the plaintiff, some of them customers and others persons in the drug business, testified that throughout this period the boxes of Recamier cream which came to their notice bore the signature. On the other hand, tradesmen who made labels and boxes for Miss Rinn stated that the Ayer name did not appear on them in any form. Advertisements of Recamier cream made no mention of the Ayer name. The letterheads which had featured the signature in earlier times no longer carried it. The defendant also called witnesses connected with wholesale drug houses who stated that the Recamier products purchased by them did not carry the signature. Although the plaintiff was able to produce many boxes, bottles, and circulars that had been in use by the old corporation, prior to 1896 when Mrs. Ayer was connected with the business, all bearing the signature, it produced practically no boxes, bottles, or circulars that had been made for Miss Rinn during this later period.

The 1886 trade-mark registration expired in 1916 without renewal. In June, 1920, Miss Reynolds, who had bought the business a month before, filed application for registry of the crest and word "Recamier" as a trademark. The original application made no mention of the Ayer signature. In February, 1921, while that application was still pending, however, she filed an amended application wherein the language of the 1886 registration was followed in mentioning the facsimile signature of Harriet Hubbard Ayer as arranged below the crest, but as capable of omission without affecting the essentials of the trademark. Registration was granted on December 13, 1921, the trade-mark being described as follows: "This trademark consists of the word-symbol 'Recamier' and a crest composed of fasces surmounted by a coronet, out of which rises the head of a lion. These are arranged as shown in the accompanying drawing, in which the word 'Recamier' with the word 'Cream' following it are in block capital letters and arranged in the form of an arch over the said crest, and the facsimile of the signature of Harriet Hubbard Ayer (the original registrant of this trademark and my predecessor) is arranged below the said crest."

At some time between 1920 and 1931 (the precise time does not appear) Miss Reynolds offered for sale jars of face cream bearing the Ayer signature as well as the name "Recamier" and the crest. In 1931 the plaintiff was organized as a New York corporation, succeeded to Miss Reynolds' business, put on the market a full line of products and straightway commenced this suit.

The defendant is a New York corporation organized in 1907. Though sued as Harriet Hubbard Ayer, Inc., its real corporate name is simply Harriet Hubbard Ayer. Its organizers received permission to use the name Harriet Hubbard Ayer from one of Mrs. Ayer's daughters, receiving at the same time the right to use certain formulas prepared or collected by Mrs. Ayer. It commenced manufacturing and selling face cream, hair tonic, and similar articles. In 1908 the trade-mark "Harriet Hubbard Ayer" in script form was registered by one Thomas, who was active in the defendant's business. This mark was assigned to the defendant and was renewed in 1928. The mark has been used without interruption since 1907 on a great variety of toilet articles made by the defendant.

The plaintiff has proved, as bearing upon its contention that the defendant's counterclaim should be dismissed because of unclean hands, that the latter has made various misrepresentations as to its business and its products. In the earlier years of its existence, it referred to itself in the feminine gender in some of its advertising, plainly implying that it was the original and natural Harriet Hubbard Ayer, still living and conducting the business. Down to 1921, at least, it also represented at various times that it had formerly made Recamier cream, and that the face cream then being sold by it was made from the same formula as Recamier cream, neither of which statements was true. Further, in applications for registry of various trade-marks, the defendant's officers made statements that were false. As to the word "Cuxuria," it was stated in 1908 by Thomas that the trade-mark had been used "in my business and that of my predecessor, Harriet Hubbard Ayer, since January 1st, 1895." In the 1914 application for the word "Ayeristocrat," the word was said to have been used in the defendant's business and in that of its predecessor, Harriet Hubbard Ayer, since 1898. And in the 1921 applica-

tion for the Ayer signature on toilet soaps it is stated that the mark had been used in the defendant's business or in its predecessor's business ever since 1894. All these statements were concededly untrue, as was also a statement, made in a 1928 price list, that the defendant was established in 1870. The fact is that it was established in 1907 and that it had no predecessor in business.

At the present time the defendant is selling its goods with the trade-mark "Harriet Hubbard Ayer" in script, and with Harriet Hubbard Ayer named as the maker. Its circulars refer to the "famous Harriet Hubbard Ayer Beauty Preparations," "Harriet Hubbard Ayer's Face Powder," and so forth. While the fact that it is a corporation is not set forth on the boxes, jars, and labels, that fact was set forth on its 1928 price list, and in at least some of the circulars now used the corporate name is given as Harriet Hubbard Ayer, Incorporated.

■ In its bill, the plaintiff alleged as a first count violation of the trade-mark registered by Mrs. Ayer in 1886 and again by Miss Reynolds in 1921. In a second count it set forth a cause of action for unfair competition. The defendant counterclaimed for infringement of the trade-mark registered by Thomas in 1908 and renewed in 1928. In the course of the trial, the defendant's motion to dismiss the unfair competition count for lack of jurisdiction was granted. Both parties are New York corporations, and such jurisdiction as the court has is derived solely from the registration of the several trade-marks. Whatever the distinctions recognized in other circuits [see Vogue Co. v. Vogue Hat Co. (C. C. A.) 12 F.(2d) 991], it has been laid down in this circuit as a sweeping rule that, where there is no diversity of citizenship, a count for unfair competition cannot be tacked to a count for violation of a registered trade-mark. Planten v. Gedney (C. C. A.) 224 F. 382. See Ingrassia v. A. C. W. Mfg. Corp. (C. C. A.) 24 F.(2d) 703, 704. With the element of unfair competition out of the case, the issue is the trade-mark one.

■ 1. In my opinion, the plaintiff's count for infringement of trade-mark does not show a cause of action cognizable in this court. There being no diversity, jurisdiction rests solely upon section 17 of the Trade-Mark Act (15 USCA § 97), by virtue of which the district court may hear cases involving trade-marks which are registered under the act. If there is no registry of the Ayer name as the trade-mark by the plaintiff or any of

its predecessors, there is no jurisdiction. Elgin Nat. Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 S. Ct. 270, 45 L. Ed. 365. True, the plaintiff's bill alleges that both Mrs. Ayer in 1886 and Miss Reynolds in 1921 registered a trade-mark embodying the Harriet Hubbard Ayer signature; but the applications and certificates themselves, which are annexed to the bill, show on their face that in each case the trade-mark which was in fact registered covered no more than the word "Recamier" and the crest. In the 1886 registration, the exclusion of the Harriet Hubbard Ayer signature from the trade-mark is emphatic. The elements of the trade-mark are twice specified in the description as "Recamier" and the crest. The Ayer signature shown in the drawing is explained as being merely something generally "arranged with" the trade-mark. This was an unmistakable disclaimer of the signature as part of the mark itself. Moreover, the Ayer registration expired in 1916, and could in no event give jurisdiction over this suit commenced in 1931. In the 1921 registration, the exclusion of the Ayer signature is not as emphatic, but it is plain enough. Here again the mark is described as consisting of "Recamier" and the crest. The Ayer signature is "arranged" with the trade-mark. And the mark is said in this registration to be the same as that registered by Mrs. Ayer, which, as shown above, plainly did not cover the signature. The bill, therefore, did not show jurisdiction, and would have been dismissed on motion.

■ The defendant, however, saw fit to put in a counterclaim wherein it appears that it registered a trade-mark covering the Ayer signature. Due to the counterclaim, the case does involve a registered trade-mark covering the Ayer signature and the United States courts have jurisdiction. The merits of the conflicting claims to the Harriet Hubbard Ayer trade-mark will therefore be considered. The acquisition of a trade-mark being dependent upon use and not upon registration, the plaintiff is not necessarily foreclosed on the merits because the Ayer signature has never been registered as a trade-mark by it or its ancestors. If its use is a prior and unabandoned one, the defendant's use is an infringement.

■ 2. The defendant's use of the Ayer signature as a trade-mark has been continuous since registration in 1908, if not since incorporation in 1907. For the plaintiff to prevail, therefore, it must show that one of its predecessors had used the signature as

a trade-mark prior to that time, and also that such use had not been abandoned in 1907 or 1908. The proof establishes the contrary of both these propositions.

Mrs. Ayer and also the old Recamier Company made copious use of the Harriet Hubbard Ayer signature on boxes and labels between 1886 and 1896. But the 1886 registration stands as an admission that the signature was not part of the trade-mark. While the registration of a trade-mark does not prevent the later adoption of another device as a common-law trade-mark for the same article, the registration is evidence to show what was really claimed as the trade-mark. A limited registration is a strong indication against broader rights. Kohler Mfg. Co. v. Beshore (C. C.) 53 F. 262, affirmed in (C. C. A.) 59 F. 572; Richter v. Reynolds (C. C. A.) 59 F. 577. Here the signature was not part of the mark, but was part of the dress of the goods. The fact that the name of the manufacturer or of an individual connected with the product is given prominence on the product along with the trade-mark does not merge the name into the trade-mark. In re William Crawford & Sons, Ltd., [1917] 1 Ch. 550, 555. Doubtless Mrs. Ayer or the company could have prevented others from using the name, but their right to relief would have come from the law of unfair competition rather than the law of trade-marks.

There are two more pieces of evidence that point in the same direction. When Mrs. Ayer assigned her trade-mark to the old Recamier Company in 1887, she described it as consisting of the word "Recamier" and the crest. The Ayer signature was not mentioned. And, when Miss Rinn purchased the trade-mark with the other Recamier assets in 1896, she promptly discontinued using the Ayer signature when her right to it was disputed by Mrs. Ayer. If the signature had been part of the trade-mark, it is safe to say that Miss Rinn, the undisputed owner of the trade-mark, would not have surrendered. The practical construction then placed upon the scope of the trade-mark by the interested parties is of prime importance. The conclusion is inevitable that the use made of the signature by Mrs. Ayer and the old Recamier Company was a nontrade-mark use; the signature was part of the dress of the goods, ancillary to the trade-mark, but not a part of it. But, if this conclusion is erroneous, the plaintiff must still face the matter of abandonment of all use of the signature in 1897.

In considering the issue of abandonment, we pass to the Rinn régime commencing in 1896. It starts with her affidavit in 1897 that she has discontinued using the Ayer signature. The weight of evidence, I think, indicates that she never resumed it to an appreciable extent. In addition to the testimony of tradesmen who made her boxes and labels and the testimony of wholesale druggists who handled her products, we have the fact that her advertisements made no mention of Harriet Hubbard Ayer, the fact that practically no goods or literature definitely identified with the Rinn period were produced by the plaintiff, and the fact that Miss Rinn made no protest when the defendant launched its ship with the Harriet Hubbard Ayer flag flying from the mast. There is also the fact, quite significant in my opinion, that Miss Reynolds in her original application for registration in 1920 failed to mention the Ayer signature as comprising part of the trade-mark, and that her letterheads at the time carried only Recamier and the crest as the trade-mark.

These pieces of proof outweigh the oral evidence given by the plaintiff's witnesses as to continuity of use of the Ayer signature, and necessitate the conclusion that these witnesses have unwittingly confused the Recamier products of this period with those put out earlier by the old Recamier Company, and perhaps also with those put out later by Miss Reynolds. I say "unwittingly," because the sincerity of most of these witnesses was manifest. The defendant having proved an unquestioned abandonment of the Ayer signature in 1897, the burden of proving a resumption of it by Miss Rinn was shifted to the plaintiff, and in my opinion the plaintiff has not sustained the burden. I find, therefore, that Miss Rinn had the intent to abandon any and all use of the Ayer signature, and that in 1897 she did in fact abandon it once and for all. See Baglin v. Cusenier Co., 221 U. S. 580, 31 S. Ct. 669, 55 L. Ed. 863; Beech-Nut Packing Co. v. Lorillard Co., 273 U. S. 629, 47 S. Ct. 481, 71 L. Ed. 810; Rockowitz Corset & Brassiere Corp. v. Madame X Co., Inc., 248 N. Y. 272, 162 N. E. 76.

The use of the signature made by Miss Reynolds is of little consequence, because it is comparatively recent, long after the period of the defendant's continuous use had commenced. But even her use was apparently a nontrade-mark use. As already explained, her registration while mentioning the signa-

ture did not claim it as part of the trademark, and presumably her use of the device was of the same character as the use by Mrs. Ayer and the old company many years ago— as an accessory but not as a trade-mark.

For these reasons I am satisfied that priority of use is with the defendant. The plaintiff's bill fails on the merits, and the defendant is entitled to prevail on its counterclaim, unless the misrepresentations made by it bar relief.

3. A court of equity will not protect the trade-mark of a party who himself is guilty of materially false or misleading representations in the trade-mark or in his advertisements or business relative to the trade-mark. Manhattan Medicine Co. v. Wood, 108 U. S. 218, 2 S. Ct. 436, 27 L. Ed. 706; Worden & Co. v. California Fig Syrup Co., 187 U. S. 516, 23 S. Ct. 161, 47 L. Ed. 282; Prince Mfg. Co. v. Prince's Metallic Paint Co., 135 N. Y. 24, 31 N. E. 990, 17 L. R. A. 129. This rule, always recognized in equity, has been written into the present Trade-Mark Act (see section 21 [15 USCA § 101]). It was held in the Manhattan Medicine Co. Case that misrepresentations as to the identity of the manufacturer required denial of relief against infringement. See, also, Siegert v. Abbott, 61 Md. 276, 48 Am. Rep. 101; Hazlett v. Pollack Stogie Co. (C. C. A.) 195 F. 28, 39 L. R. A. (N. S.) 632. In later decisions the rigor of the rule has been relaxed to this extent, that, where the mark has come to designate the article rather than the personality of the maker, a successor who continues the use of the founder's name without calling attention to the change in ownership will not be turned out of court on that account. Layton Pure Food Co. v. Church & Dwight Co. (C. C. A.) 182 F. 24; Chickering v. Chickering & Sons (C. C. A.) 215 F. 490; Keeley Co. v. Hargreaves, 236 Ill. 316, 86 N. E. 132; Gruber Almanack Co. v. Swingley, 103 Md. 362, 63 A. 684. See, also, Jacobs v. Beecham, 221 U. S. 263, 31 S. Ct. 555, 55 L. Ed. 729.

In applying the "unclean hands" rule, the situation as it exists at the time of suit is the guide. A party is not penalized because of misrepresentations that have been abandoned before that time, even though they may have been effective in building up his business. Coca-Cola Co. v. Koke Co., 254 U. S. 143, 41 S. Ct. 113, 65 L. Ed. 189; Moxie Nerve Food Co. v. Modox Co. (C. C.) 153 F. 487; Johnson & Johnson v. Seabury & Johnson, 71 N. J. Eq. 750, 67 A. 36, 12 L. R. A.

(N. S.) 1201, 124 Am. St. Rep. 1007, 14 Ann. Cas. 840. Consequently, the false statements made by the defendant at various times prior to 1931, but not now persisted in, cannot be taken into account in determining whether the defendant should be given relief. The false statements made in the applications for registry of the Luxuria and Ayeristocrat trade-marks must be left out of consideration, for the additional reason that they are not closely enough related to the present issue, the trade-mark on the Ayer signature, to subject the defendant to the unclean hands rule. Shaver v. Heller & Merz Co. (C. C. A.) 108 F. 821, 834, 65 L. R. A. 878; Andrew Jergens Co. v. Bonded Products Corporation (C. C. A.) 21 F.(2d) 419, 423. The inquiry is thus narrowed to the alleged iniquity of the defendant's present conduct in respect to the Harriet Hubbard Ayer signature and name:

So far as the trade-mark is concerned, I cannot say that there was fraud in the acquisition or in the present use of it. The defendant received the right to use Mrs. Ayer's name from her daughter, along with a batch of formulas prepared by Mrs. Ayer. It is unnecessary to consider what rights, if any, the defendant would have had in the name without the formulas. See Falk v. American West Indies Trading Co., 180 N. Y. 445, 73 N. E. 239, 1 L. R. A. (N. S.) 704, 105 Am. St. Rep. 778, 2 Ann. Cas. 216. With the formulas there was a basis, not strong, but nevertheless sufficient, for using Harriet Hubbard Ayer as a trade-mark and trade-name. I cannot assume that the formulas were the identical ones formerly used by Mrs. Ayer when she was in business, nor can I take it for granted that the formulas were not actually followed by the defendant in conducting its business.

The defendant represents that the products are made by Harriet Hubbard Ayer. The statement is literally true, because that is the defendant's proper corporate title. When it was incorporated, it was permissible for a New York corporation to take such a name. The present requirement that corporations shall take names that serve to distinguish them from individual proprietors and partnerships applies only to corporations formed since January 1, 1912. General Corporation Law (Consol. Laws, c. 23) § 9. See White v. William G. White, 160 App. Div. 709, 145 N. Y. S. 743. The defendant therefore exercised its legal right in taking and maintaining Harriet Hubbard Ayer as its

corporate name. It is not now concealing the fact that it is a corporation, except as might be inferred from the name itself; on the other hand, it is now inaccurately adding the suffix "Inc." on some of the circulars distributed with its products. In Chickering v. Chickering & Sons, supra, the plaintiff had come to New York (prior to 1912) to be incorporated as Chickering & Sons, the name of the old firm. The place of business was in Massachusetts, and incorporation there would have made mandatory the use of words indicative of a corporation. It was held that the unclean hands doctrine did not apply. I think that the Chickering Case is in point here.

There is another phase of the matter that deserves consideration. The defendant has used its name and its trade-mark for twenty-five years, and seems to have built up a large business. How many of its present customers ever heard of the Harriet Hubbard Ayer who died nearly thirty years ago I cannot say; probably most of them know the name only because of the products put on the market by the defendant. It may be that back in 1907, and for some years later, the defendant's name conveyed to many persons the false idea that Mrs. Ayer, whom they had heard of as a writer, lecturer, or dealer in cosmetics, was still living and in charge of the business. To-day that connotation is gone. The reputation now enjoyed by the name must be largely of the defendant's own creation. See Coca-Cola Co. v. Koke Co., supra, 254 U. S. at pages 146, 147, 41 S. Ct. 113, 65 L. Ed. 189; Lambert Pharmacal Co. v. Bolton Chemical Corp. (D. C.) 219 F. 325. In the latter case Judge Learned Hand pointed out that, while the word "Listerine" may once have indicated to some that Lord Lister had sponsored the article (which was not the truth), that connotation had disappeared in the course of thirty-five years, and the name had come to mean only the article itself. The original misrepresentation had lost its effect, and the manufacturer was given relief against an infringer.

Upon the whole case I find that the plaintiff and its predecessors never registered the signature of Harriet Hubbard Ayer as a trade-mark and never used it as a trade-mark; that their only use of the Ayer signature was a nontrade-mark use for the period from 1886 to 1896 and for a period subsequent to 1920; that the defendant or its agent registered the name "Harriet Hubbard Ayer" in script form as a trade-mark in 1908, and has used the trade-mark uninterruptedly since that time;

that the defendant, and not the plaintiff, is the present owner of the trade-mark rights in the name; and that the defendant should not be denied relief because of unclean hands. Accordingly, the plaintiff's bill will be dismissed, and the defendant will have a decree on the counterclaim.